Filed 5/29/13  In re L.T. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re L.T., et al., Persons Coming Under the Juvenile Court Law. | B243091 |
| | (Los Angeles County Super. Ct. No. CK85010) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Respondent,<br><br>        v.<br><br>PATRICK T.,<br><br>        Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County.  Terry ThanhTruong, Referee.  Affirmed.

Lauren K. Johnson, under appointment by the Court of Appeal, for Appellant.

No appearance for Respondent.

_____

Patrick T. (father) appeals from an order returning his children, L.T. and A.T., to their mother after they were declared dependents of the court. We conclude substantial evidence supports the order and affirm.

## BACKGROUND

In one week in August 2010, the Los Angeles Department of Children and Family Services (DCFS or the department) received three child abuse referrals regarding five-year-old L.T. and her sister, two-year-old A.T. The first referral alleged father physically abused their mother, Abby T. (mother) in front of the children, and when L.T. attempted to intervene, pushed her down, injuring her. An investigation revealed father had a criminal history and alcohol abuse problems, frequently engaged in physical violence with mother, and was under a two-year restraining order enjoining him from living in the home where mother and the girls lived with the paternal grandfather. When contacted by a DCFS social worker, mother engaged in a profanity-laden tirade but eventually agreed to enroll in domestic violence counseling and not to allow father back into the home.

A second referral that same day alleged mother used methamphetamines and physically abused the girls. When DCFS investigated, mother launched into another screaming, profanity-laden tirade and refused to undergo drug testing.

A third referral four days later alleged mother neglected the children, screamed at them outside the home, and used drugs. Mother at first avoided DCFS's social worker, and when contact was eventually made, screamed and swore at the social worker and refused to participate in a Team Decision Making (TDM) meeting.

Two months later, in October 2010, L.T. reported father was living in the home and slept on the couch, and upon investigation a DCFS social worker discovered mother had told a CalWorks social worker that father would provide childcare in the home. When a DCFS social worker arrived at the home with police officers, mother denied having seen father or knowing where he lived. She agreed to attend a TDM meeting but three days later called to cancel it.

L.T. stated she felt safe with mother and father in the home, was happy with mother, and mother was nice to her. Her teacher reported L.T. was adjusting fairly well to kindergarten.

DCFS filed a dependency petition under Welfare and Institutions Code[1] section 300, alleging the parents engaged in physical altercations in the children's presence. At the detention hearing on November 5, 2010, the juvenile court detained the children from father and released them to mother's custody, with father given monitored visitation in DCFS offices only. Mother was ordered to take part in domestic violence counseling and submit to on-demand drug testing.

In December 2010, father's parole officer visited the house and found father living there. On December 22, 2010, father punched mother in the face, pushed her into a window, and pushed her to the ground and held her there, threatening to snap her neck if she called the police. He was arrested on charges of battery and violating probation.

On January 14, 2011, father reported that mother loves the children and was "a decent mother." He felt the children were "better off in her care than being removed from her care," and observed that mother would "have some drinks but she never gets drunk." Father said he had never seen mother incapable of caring for the girls.

At the jurisdiction/disposition hearing on January 26, 2011, the juvenile court sustained the dependency petition pursuant to subdivisions (a), (b), and (j) of section 300, ordered mother and father to participate in a domestic violence program, ordered mother to continue to submit to drug tests and participate in a substance abuse program if she missed or failed a test, and ordered father to complete a parenting program and follow all conditions of his probation.

In June 2011 mother twice tested positive for methamphetamine but vehemently denied to a DCFS social worker either having tested positive or using the drug, and told the social worker, "I just want you guys to get the fuck out of my life." However, she admitted to a Department of Public Social Services (DPSS) worker that she used

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

methamphetamines to self-medicate for depression and felt overwhelmed and stressed out. She reported she was attending domestic violence counseling but had no letter of progress, and agreed to enroll in a substance abuse program and submit to drug tests. In July 2011 mother missed two drug tests. She and the girls continued to live with paternal grandfather. Father was homeless.

In July 2011, mother yelled and cursed at DCFS social workers during a TDM meeting while the children were present. She told social workers she suffered from severe depression and had applied for Social Security benefits. Father reported mother became verbally abusive toward L.T. and A.T. when she was under the influence of methamphetamines or alcohol, and had told him, "I should get a gun and blow my brains out." He expressed concern for the children's safety and reported mother had been using methamphetamines and alcohol consistently for several weeks. He said the girls would often become frightened and anxious around her, which the girls confirmed in later interviews.

The paternal grandfather reported he could no longer supervise mother and the children because she was becoming increasingly hostile and verbally aggressive toward him while the children were present. She constantly yelled and cursed at the girls and told him she "should just take-off with the children."

On July 15, 2011, when confronted at home about her positive and missed drug tests, mother reported she had been unable to enroll in a residential treatment program and became abusive to the DCFS social worker and was restrained by police. L.T. and A.T. were removed from the home and placed in foster care.

By August 2011, mother was in the Prototypes Women's Center (Prototypes), a residential treatment facility, and had been diagnosed with Major Depressive Disorder and was receiving mental health therapy. Father had completed no court-ordered services and was incarcerated for a probation violation.

On September 8, 2011, the juvenile court ordered that mother undergo a psychological/psychiatric evaluation. The results of this evaluation were apparently never forwarded to the court or made part of any DCFS report.

4

On January 4, 2012, mother was discharged from Prototypes for noncompliance with house rules. An assistant director at Prototypes reported the following: "From the initial enrollment date, [mother] exhibited intense bouts of extreme anger and hostility, and engaged in severe verbal profanity towards her children, her peers, and staff. [Mother] verbalized that she did not want to remain in treatment because treatment was 'too controlling,' and the only reason she stayed in treatment was due to her DCFS requirements with the children. Numerous peers and staff witnessed [mother] being verbally abusive towards her children. . . . [¶] On December 17, 2011, [mother] was put on a therapeutic contract which was to give increased assistance to her in regards to her extreme level of anger and rage. [She] was counseled on the terms of the contract, and was informed of the potential consequences if she deviated from the contract. [Her] request to change mental health therapists was also granted, and she was given immediate access to the therapist of her choice. [¶] On December 21, 2011, it was reported by her roommates that [mother] had spanked her child, and used profanity towards her child. When confronted on her behavior, [mother] made threatening remarks . . . to her roommate. [She] was once again counseled on her therapeutic contract, and informed if she violated the contract once more that she would be discharged from treatment. [¶] On January 4, 2012, it was reported from her roommates that her daughter had wet the bed and [mother] began cussing at her daughter . . . , and when the roommates told [her] to stop cussing at her daughter, [she] proceeded to curse at them. At this point, [mother] was discharged from treatment. [¶] . . . [¶] It is my clinical opinion, as well as the treatment team[']s, that [mother] would benefit from continued residential treatment with the modification of entering treatment without her children. Based on the level of anger, hostility, and control issue that [she] exhibits, I believe she needs to first work on deep seated issues stemming from her own childhood before she will be capable of being an appropriate parent to her children."

Mother's counselor at Prototypes reported that mother was "out of control and it's not healthy for the children to be around her when she is acting like this." DCFS reported that "[b]ased on the fact that mother . . . has been spanking, cursing, and call[ing] her

5

children names, after continuous treatment at Prototypes; the Department has serious concerns regarding the safety of the children. Overall, this particular family can be categorized as being 'high' risk for future abuse. Thus the Department believes that continued detention and placement of the children is necessary to protect the children's safety."

The children were placed with a maternal aunt. The aunt reported that visits between mother and the children were "chaotic," and mother found it difficult to deal with the children at times.

Mother stated, "'I don't believe that it is "good" idea for the children to be with m[e] right now and I think that girls were returned to me too soon. I really need to work on my own issues before the girls come back to me. I want the girls to stay with my sister, until I finish my programs.'" Father agreed that mother was "not ready to have the girls back."

On January 20, 2012, mother had a positive toxicology test.

In February 2012 mother reentered Prototypes. In April 2012 her counselor reported mother had identified relapse triggers and was using coping skills, maintained good attendance and participation with her various therapy groups, and appeared active in her recovery. Mother regularly tested negative for drugs and alcohol and attended Alcoholics Anonymous meetings one or two times per week. She completed domestic violence and parenting education classes, "parenting center vocational training," and a "seeking safety" curriculum, and received a certificate for active participation in anger management classes. Monitored visits with the children between February and April 2012 went well, and in May 2012 visitation was increased to unmonitored day visits on Prototypes grounds. These visits also went well, mother's counselor reporting that mother was learning how to implement her new parenting skills. In July 2012 visitation was increased to overnight visits from Saturday to Sunday. The counselor reported these were successful and expressed no concerns about them. The maternal aunt reported that the children seemed happy after the visits and the children reported they enjoyed them and wanted to continue visitation.

Mother nevertheless reported sometime between February and July 2012 that she needed more time to work on her sobriety and domestic violence, anger management, depression and parenting needs prior to regaining custody of her children. She stated she would be ready to have the children return to her care "within the next 6 months."

The children's maternal aunt said she would be interested in legal guardianship if they could not be reunified with their parents.

At a six-month review hearing on August 2, 2012, both mother and father sought family maintenance services and return of L.T. and A.T. to their respective custody. Counsel for the children requested that they be returned to mother in light of her substantial compliance with the case plan, but DCFS recommended that they not be returned to mother until she obtained transitional housing and stable employment, which the Department said would occur in 30 days.

The juvenile court found that based on mother's compliance with the case plan, return of the children to her would not create a substantial risk of detriment to their safety, protection or physical or emotional well being. It ordered the prior placement order terminated, remanded the children to mother, and ordered DCFS to continue family maintenance services. In the end, the court told mother, "Let me make myself very clear. Let me make myself very, very clear to you. If you mess up one more time and I have to remove your children yet another time, you're not going to get them back by me. [¶] Is that understood . . . ?" Mother said, "Yes, ma'am."

Father appeals from the order returning the children to mother's care.

## DISCUSSION

Father contends the order returning L.T. and A.T. to mother was unsupported by substantial evidence because as of the date of the hearing neither the court nor DCFS had received a copy of the psychiatric evaluation that was ordered back in September 2011 and which mother purportedly underwent in December 2011. Father argues that lack of a report on mother's psychiatric evaluation, and her lack of permanent transitional housing or employment, prevented the juvenile court from returning the children to mother. We disagree.

7

Section 366.21, subdivision (e), which governs six-month review hearings in dependency proceedings, provides in pertinent part: "At the review hearing held six months after the initial dispositional hearing . . . , after considering the admissible and relevant evidence, the court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child.  The social worker shall have the burden of establishing that detriment. . . . The failure of the parent or legal guardian to participate regularly and make substantive progress in court-ordered treatment programs shall be prima facie evidence that return would be detrimental.  In making its determination, the court shall review and consider the social worker's report and recommendations and the report and recommendations of any child advocate appointed pursuant to Section 356.5; and shall consider the efforts or progress, or both, demonstrated by the parent or legal guardian and the extent to which he or she availed himself or herself to services provided, taking into account the particular barriers to an incarcerated, institutionalized, detained, or deported parent's or legal guardian's access to those court-mandated services and ability to maintain contact with his or her child.  [¶]  Regardless of whether the child is returned to a parent or legal guardian, the court shall specify the factual basis for its conclusion that the return would be detrimental or would not be detrimental.  The court also shall . . . order any additional services reasonably believed to facilitate the return of the child to the custody of his or her parent or legal guardian."

"The dependency scheme is based on the law's strong preference for maintaining family relationships whenever possible.  [Citations.]  When a child is removed from parental custody, certain legal safeguards are applied to prevent unwarranted or arbitrary continuation of out-of-home placement.  [Citations.]  Until reunification services are terminated, there is a statutory presumption that a dependent child will be returned to parental custody." (*In re Yvonne W*. (2008) 165 Cal.App.4th 1394, 1400.)  As relevant here, section 366.21, subdivision (e) requires the juvenile court at the six-month review

8

hearing to return the child to the custody of the parent unless it determines, by a preponderance of the evidence, that return of the child would create a substantial risk of detriment to the child's safety, protection, or physical or emotional well-being.

"The Agency has the burden of establishing detriment. [Citations.] The standard for showing detriment is 'a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member.' [Citation.] Rather, the risk of detriment must be *substantial*, such that returning a child to parental custody represents some danger to the child's physical or emotional well-being. [Citations.] [¶] In evaluating detriment, the juvenile court must consider the extent to which the parent participated in reunification services. [Citations.] The court must also consider the efforts or progress the parent has made toward eliminating the conditions that led to the child's out-of-home placement." (*In re Yvonne W.*, *supra*, 165 Cal.App.4th at p. 1400.) We review the record for substantial evidence in support of the court's determination. (*Id*. at pp. 1400-1401.)

""""When the sufficiency of the evidence to support a finding or order is challenged on appeal, the reviewing court must determine if there is any substantial evidence, that is, evidence which is reasonable, credible, and of solid value to support the conclusion of the trier of fact. [Citation.] In making this determination, all conflicts [in the evidence and in reasonable inferences from the evidence] are to be resolved in favor of the prevailing party, and issues of fact and credibility are questions for the trier of fact. [Citation.]"' [Citation.] While substantial evidence may consist of inferences, such inferences must rest on the evidence; inferences that are the result of speculation or conjecture cannot support a finding." (*In re Precious D*. (2010) 189 Cal.App.4th 1251, 1258-1259.)

Here, the uncontroverted evidence showed that mother substantially completed her case plan and has been sober for approximately six months. The Prototypes counselor reported that mother was committed to her treatment, that she appeared to have benefitted from the services provided, and that she made changes in her life that are in her children's best interests. Mother has acquired knowledge of positive parenting and is

9

able to employ anger management techniques.  She has stable and "appropriate" housing at a long-term shelter where she can safely parent her daughters.  In essence, mother did everything DCFS asked of her, including eliminating the conditions that led to the children's out-of-home placement.  Further, the children were happy with mother's improved behavior during regular visits.  Nothing in the record indicates that mother is incapable of adequately parenting the girls, and DCFS presented no specific and objective evidence to show the children would suffer detriment, including serious psychological or emotional injury, if they were placed with mother at the Prototypes facility.  The juvenile court's order returning the children to mother was thus supported by substantial evidence.

Although father argues the trial court's order placing L.T. and A.T. with mother was unsupported by substantial evidence, he omits from his argument any reference to evidence showing mother complied with the case plan, including that she maintained good attendance and participation with her various therapy groups, including anger management classes, was active in her recovery, regularly tested negative for drugs and alcohol, attended Alcoholics Anonymous meetings regularly, and completed domestic violence and parenting education classes, vocational training, and a "seeking safety" curriculum.  Father ignores that months of monitored and unmonitored visits with the children went well and mother's case manager at Prototypes reported mother had identified relapse triggers, was using skills to cope with them, and was learning to implement her new parenting skills.  The children seemed happy after visits with mother and reported they wanted visitation to continue.

"An appellant must fairly set forth all the significant facts, not just those beneficial to [himself]."  (*In re S.C.* (2006) 138 Cal.App.4th 396, 402.)  Here, father focuses only on the lack of a report detailing the results of mother's December 2011 psychological evaluation and cites only evidence favorable to his position, ignoring all to the contrary.  "Such briefing is manifestly deficient.  [¶]  'The rule is well established that a reviewing court must presume that the record contains evidence to support every finding of fact, and an appellant who contends that some particular finding is not supported is required to set

forth in his brief a summary of the material evidence upon that issue. Unless this is done, the error assigned is deemed to be waived. [Citation.] It is incumbent upon appellants to state fully, with transcript references, the evidence which is claimed to be insufficient to support the findings.' [Citations.]" (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887-888.)

We need not further discuss the evidence supporting the juvenile court's orders because by failing to challenge its sufficiency and failing to discuss the issue in any meaningful way, father waives any challenge to its sufficiency. (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881; *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 677; *Road Sprinkler Fitters Local Union No. 669 v. G & G Fire Sprinklers, Inc.* (2002) 102 Cal.App.4th 765, 782.)

## DISPOSITION

The juvenile court's orders are affirmed.

NOT TO BE PUBLISHED.


                                                        CHANEY, J.

We concur:



        MALLANO, P. J.



        ROTHSCHILD, J.


11